THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| US CARGO DIRECT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 22 C 3925 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| PNC BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff US Cargo Direct, Inc., applied for and received a Paycheck Protection Program loan for $1,524,200 through Defendant PNC Bank NA. (Dkt. 1, dkt. 7). US Cargo used the loan proceeds to pay its workforce, comprised almost entirely of independent contractor truck drivers, believing the loan would be completely forgiven. When PNC informed US Cargo that only about $53,000 would be forgiven under the program's terms, US Cargo sued for breach of contract, unjust enrichment, breach of fiduciary duty, negligent misrepresentation, and promissory estoppel. (Dkt. 1, dkt. 7). PNC moves to dismiss all claims. (Dkt. 14). For the following reasons, PNC's Motion is granted. [14]

**BACKGROUND**

At the onset of the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which included the Paycheck Protection Program (PPP), Pub. L. 116-136, § 1102, 131 Stat. 281, 286. (Dkt. 7 ¶ 14). The PPP gave cash-flow assistance through 100% federally guaranteed loans—backed by the Small Business Administration (SBA)—to employers who maintained their payroll during the pandemic. (*Id.* ¶¶ 14, 16). PPP loans used for qualified expenses, including payroll costs, were to be completely forgiven. (*Id.* ¶ 16).

1

PNC Bank is an SBA lender that received, processed, and approved PPP loan applications. (*Id.* ¶¶ 13, 17). US Cargo Direct, a trucking and logistics company, has banked with PNC since 2018. (*Id.* ¶¶ 29–30). US Cargo's workforce primarily comprises independent contractor truck drivers. (*Id.* ¶ 32). PNC solicited US Cargo to apply for a PPP loan in March 2020. (*Id.* ¶¶ 18, 33). PNC provided US Cargo with information about the PPP and its rules. (*Id.* ¶¶ 36–40).

US Cargo applied for a PPP loan per PNC's instructions and through PNC's portal. (*Id.* ¶¶ 18, 23, 40; dkt. 7-6 (Paycheck Protection Program Borrower Application Form)). The SBA-issued Application Form required applicants to attest that, "[t]he Applicant . . . had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC," and that the "funds will be used to retain workers and maintain payroll . . . ." (Dkt. 7 ¶ 42; dkt. 7-6 at 2). The Application required the applicant "to provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amount of payroll costs . . . ." (Dkt. 7-6 at 2). US Cargo certified "I understand that loan forgiveness will be provided for the sum of documented payroll costs." (*Id.*) The Application Form further specified:

> With respect to "purpose of the loan," payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wage, commissions, income, or net earnings from self-employment or similar compensation.

(*Id.* at 3). US Cargo reported 112 Employees and an average monthly payroll of $609,684.02 on its Application. (*Id.* at 1). Under the PPP formula, the average monthly payroll multiplied by 2.5 yielded a total of $1,524,210.05. (*Id.*)

By then, however, the SBA had also published its Interim Final Rules implementing the PPP provisions of the CARES Act. (Dkt. 7 ¶¶ 24, 52). The Rules clarified that payments PPP loan recipients might make to independent contractors would not count as payments to employees, and thus would not be eligible for loan forgiveness. (*Id.*; dkt. 7-1). PNC was aware of the classification of US Cargo's workforce. (Dkt. 7 ¶¶ 31–32). Nevertheless, when they had solicited the loan, "PNC representatives specifically indicated to US Cargo that Loan proceeds used to pay truck drivers who worked for US Cargo as independent contractors would be 'eligible for forgiveness' (i.e., such payments would qualify as a 'Permitted Loan Purpose.')." (Dkt. 7 ¶ 35).

After applying for the PPP loan through PNC, US Cargo executed a Paycheck Protection Program Certification and a Payment [sic] Protection Program Term Note with PNC. (Dkt. 7-3 (Certification); dkt. 7-7 (Note)). The Certification required a prospective PPP borrower to certify that it "had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form 1099-MISC." (Dkt. 7 ¶ 26; dkt. 7-3 ¶ 1). The Certification also required the borrower to certify its understanding that "[t]he proceeds of the PPP Loan will (a) solely be used to retain workers and maintain payroll . . . (the **"Permitted Loan Purpose"**), and (b) be allocated as set forth in the Borrower's application for the PPP Loan." (Dkt. 7 ¶ 27; dkt. 7-3 ¶ 3). Further, the Certification indicated: "The Borrower understands and agrees that loan forgiveness may be provided if the Borrower uses all of the loan proceeds for the Permitted Loan Purpose. The actual amount forgiven will depend on the actual use of the PPP loan proceeds . . . ." (Dkt. 7 ¶ 28; dkt. 7-3 ¶ 5). Finally, the Certification stated: "The Borrower acknowledges that the Bank will confirm

3

the eligible PPP Loan amount using the Borrower's tax information that it has submitted . . . ." (Dkt. 7 ¶ 25; dkt. 7-3 ¶ 9).

The Note authorized a PPP loan to US Cargo for $1,524,200.00. (Dkt. 7 ¶ 47; dkt. 7-7 at 1). The Note specified, "The amount of forgiveness shall be calculated (and may be reduced) in accordance with the requirements of the Program, including the provisions of Section 1106 of the [CARES Act]." (Dkt. 7-7 § 3). US Cargo again attested that it "had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099-MISC." (*Id.* § 7(a)). US Cargo also acknowledged that "the certifications contained in the Paycheck Protection Program Certification and the Program application delivered to the Bank are true and correct, which certifications are hereby incorporated herein by this reference as if set forth herein." (*Id.* § 7(b)). Finally, US Cargo acknowledged that it had read and understood all provisions of the Note, and had either been advised by counsel or elected not to seek advice of counsel. (*Id.* at 10). US Cargo accepted the full PPP loan PNC authorized. (Dkt. 7 ¶¶ 47–48). PNC funded the loan the next day. (*Id.* ¶ 48).

US Cargo used the loan funds to pay its workforce, including its truck drivers, through mid-July 2020. (*Id.* ¶ 58). Several months later, PNC provided US Cargo a PPP loan forgiveness application. (*Id.* ¶ 59). It did not request 1099-MISC forms or other verification of payments to independent contractors. (*Id.*) After US Cargo applied for full loan forgiveness, PNC informed US Cargo that only $53,017 of the loan was eligible for forgiveness under the program's terms. (*Id.* ¶ 60). US Cargo then owed PNC a loan balance of $1,470,983. (*Id.*) PNC made its forgiveness eligibility determination based on the supporting documents—including the 1099-MISC forms—US Cargo had provided during the application process. (*Id.* ¶¶ 61–62). Despite having all relevant information to make the forgiveness determination since US Cargo's application, PNC never

4

informed US Cargo that nearly all its loan was ineligible for forgiveness. (*Id.* ¶¶ 63–64). US Cargo would not have taken the full PPP loan had it understood payments made to independent contractor drivers were ineligible for forgiveness. (*Id.* ¶ 65).

US Cargo sued PNC, alleging breach of contract, unjust enrichment, breach of fiduciary duty, negligent misrepresentation, and promissory estoppel. (*See* dkt. 1 (Complaint); dkt. 7 (First Amended Complaint)). PNC moves to dismiss for failure to state a claim. (Dkt. 14).

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the Court accepts all well-pleaded facts as true and "draw[s] all reasonable inferences in the [plaintiff's] favor." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 878 (7th Cir. 2022). The Court "also consider[s] any documents attached to and integral to the complaint as part of the [plaintiff's] allegations." *Id.* The complaint's "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), must offer more than "labels and conclusions" or "a formulaic recitation of the elements." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, to survive a defendant's motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

### A. State Remedies Available in Absence of Private Right of Action

PNC first argues the Court must dismiss all claims without reaching their merits, because the CARES Act does not recognize a private cause of action. (Dkt. 16 at 4–5; *see id.* at 5 ("Plaintiff's disappointment over CARES Act requirements cannot generate common law liability on the part of its Program lender.")). PNC cites a litany of cases where courts have found no private

5

cause of action exists under the CARES Act. (*Id.* at 5).[1] But unlike plaintiffs in those cases, US Cargo is not suing to enforce provisions of the CARES Act against PNC. US Cargo does not allege PNC violated the CARES Act. (*See* dkt. 20 at 4 ("US Cargo does not seek relief based on PNC's alleged violation of the Act.")). Neither does US Cargo allege it is entitled to loan forgiveness under the PPP. (*Compare* dkt. 16 at 7 ("Plaintiff's core theory that it was entitled to full Program forgiveness has no basis under the CARES Act or its implementing regulations.") *with* dkt. 20 at 5 n.2 ("US Cargo does not allege that it is entitled to forgiveness *under the CARES Act* . . . .")).

Rather, US Cargo alleges PNC violated Illinois law through its conduct administering the PPP loan. "The absence of a private right of action from a federal statute provides no reason to dismiss a claim under state law just because it refers to or incorporates some element of the federal law." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 585 (7th Cir. 2012) (citing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 448 (2005)). US Cargo can seek redress under state law for PNC's alleged breach of the contract for US Cargo's PPP loan and alleged misrepresentations about the program's terms, even if the CARES Act provides no private cause of action against a PPP lender. *See Wigod*, 673 F.3d at 585 (holding that plaintiff may allege state-law claim that defendant bank's "misrepresentation and omission of material facts misled her" about federal Home Affordable Mortgage Program's terms and that bank implemented its compliance

---

[1] *See, e.g.*, *Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 751–52 (D. Md. 2020) (concluding CARES Act included no evidence of congressional intent to create private right of action, where prospective PPP borrowers sued to enforce purported right to apply for PPP loan from defendant bank that had imposed additional loan eligibility criteria of pre-existing banking relationship); *M&M Consulting Grp., LLC v. JP Morgan Bank, N.A.*, No. SACV 20-01318JVS(KESx), 2021 U.S. Dist. LEXIS 5827, at *18–*19 (C.D. Cal. Jan. 6, 2021) ("There is no language in the CARES Act that suggests Congress intended for agents—who are not even the intended beneficiary of a statute that is designed to get money in the hands of small businesses—to have a private remedy."); *Daniel T.A. Cotts PLLC v. Am. Bank, N.A.*, No. 20-CV-185, 2021 U.S. Dist. LEXIS 107617, at *14 (S.D. Tex. Feb. 9, 2021) (finding no private right of action for borrowers' agents to collect fees from PPP lenders); *Radix L. PLC v. JPMorgan Chase Bank NA*, 508 F. Supp. 3d 515, 519–20 (D. Ariz. 2020) (concluding agent-plaintiff had no claim on merits that it was entitled to payment of agent fees by lender-defendant, but even if it did, CARES Act has no private right of action). PNC goes on to list 12 more cases in a footnote supporting the proposition that the CARES Act provides no private right of action. (Dkt. 16 at 5 n.2). But all these cases similarly involve plaintiffs seeking to enforce various provisions of the CARES Act against lenders or government officials, which is not what US Cargo seeks here.

procedures "in a way designed to thwart borrowers' legitimate expectations"); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 654–55 (7th Cir. 2015) (holding that absence of private cause of action under Higher Education Act did not displace potential state-law remedies for defendant-lender's alleged breach of contract of plaintiff-borrower's federal student loan agreement).

**B.     Breach of Contract**

The Court now turns to the merits of US Cargo's asserted claims. US Cargo alleges PNC breached its duty of good faith and fair dealing implied in every contract by misrepresenting the forgiveness qualifications for a PPP loan, which US Cargo reasonably expected to include loan funds paid to independent contractors. (Dkt. 7 ¶¶ 70–73). "To succeed on a breach of contract claim, a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2022 IL 127903, ¶ 28 (citing *Babbitt Muns., Inc. v. Health Care Serv. Corp.*, 2016 IL App (1st) 152662, ¶ 27).

As a preliminary matter, while the parties agree they had a contract, they disagree as to which documents together constitute the governing contract. *See Int'l Supply Co. v. Campbell*, 907 N.E.2d 478, 486 (Ill. App. Ct. 2009) ("The well-settled rule of contract law is that when two or more written documents are executed by the same contracting parties as part of the same transaction, those documents will be read and considered together as one contract encompassing the entire agreement between the parties, unless there is evidence that the parties intended for the documents to be read separately."). US Cargo claims the contract comprises "the PPP Term Note (inclusive of the PNC Info Sheet, Checklist, Application, and Certification, all of which were created by PNC and provided to US Cargo for consideration and/or execution of the Term Note)."

7

(Dkt. 7 ¶ 68). But the Term Note merges and integrates the contract as comprising the parties' agreements in the "Loan Documents." It defines this term as the Note and those documents executed and delivered by the Borrower in connection with the Note.[2]

In this context, the Loan Documents include only the Application, Certification, and Note; together, they comprise the governing contract. The Application was executed on April 6, and both the Certification and Note were executed on April 13; they contain the parties' agreements concerning the same transaction: the PPP loan. The PNC Info Sheet (dkt. 7-4) and Checklist (dkt. 7-5) provide general information about the PPP but have no language that can reasonably be construed as an agreement between the parties. They give no indication of execution or delivery by the borrower to the lender. Nor does the Note refer to these documents. They are not part of the contract.

Moving to the breach allegation, "every contract contains an implied covenant of good faith and fair dealing." *Eckhardt v. Idea Factory, LLC*, 193 N.E.3d 182, 194 (Ill. App. Ct. 2021) (citing *McCleary v. Wells Fargo Sec., L.L.C.*, 2015 IL App (1st) 141287, ¶ 19). "Generally, problems involving the covenant of good faith and fair dealing arise when one party to a contract is given broad discretion in performance." *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003) (citing *Northern Trust Co. v. VIII S. Mich. Assocs.*, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995)). "The covenant requires a party vested with broad discretion to act reasonably and not arbitrarily or in a manner inconsistent with the reasonable expectations of the parties." *Id.* (citing *Northern Trust*, 657 N.E.2d at 1104); *see also Eckhardt*, 193 N.E.3d at 194

---

[2] *See* dkt. 7-7 § 4 ("As used in this Note, **'Loan Documents'** means, individually and collectively, this Note, together with all other agreements and documents executed and/or delivered in connection with this Note or referred to in this Note, as amended, modified or renewed from time to time."); *see also id.* § 7(e)(iii) ("[T]his Note and the other Loan Documents, when executed and delivered by the Borrower, will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms; . . . ."); *id.* § 14 ("No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Note will be effective unless made in a writing signed by the Bank . . . .").

(same). The covenant applies where a contract is susceptible to two conflicting constructions. *Cromeens*, 349 F.3d at 395. "Parties to a contract, however, are entitled to enforce the terms of the contract to the letter, and an implied covenant of good faith cannot overrule or modify the express terms of a contract." *Northern Trust*, 657 N.E.2d at 1104.

Here, the Application requires the borrower to self-certify the number of its employees and its average monthly payroll *according to program rules*. The Loan Documents expressly place the burden on the borrower to apply for and utilize PPP funding in accordance with those rules. (*See* dkt 7-6 at 2 ("I certify that: . . . All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and *consistent with the Paycheck Protection Program Rule*."); *id.* ("The funds will be used to retain workers and maintain payroll . . . *as specified under the Paycheck Protection Program Rule*; . . .") (emphasis added)). The Note conditions loan forgiveness on the *borrower's* following PPP rules. (*See* dkt. 7-7 § 3 ("The amount of forgiveness shall be calculated (and may be reduced) in accordance with the requirements of the Program, including the provisions of Section 1106 of the [CARES Act].")). The CARES Act's regulations clearly excluded independent contractors from counting as employees in the payroll cost calculation. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,813 (Apr. 15, 2020) ("[I]ndependent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan calculation."). This Interim Final Rule was issued and available to all prospective borrowers on April 2, 2020, and republished by the SBA in an FAQ document on April 6, 2020. (Dkt. 7 ¶ 24; dkt. 7-1).

The contract's express terms obligated US Cargo at all relevant times to use PPP funds for permitted loan purposes only. These terms govern the contract. *See Northern Trust*, 657 N.E.2d at 1104. Even if the contract vested PNC with discretion to confirm the borrower's eligible loan

9

amount, and PNC acted contrary to US Cargo's expectations by approving a loan higher than that eligible for forgiveness, this cannot override the contract's express terms. *See id.* The contract instead places the burden of compliance on the borrower. US Cargo's subjective understanding of what constituted "payroll costs" as a "permitted loan purpose" is irrelevant. *See Cromeens*, 349 F.3d at 395–96 (finding contract not susceptible to two conflicting interpretations where contract defined parties' rights, such that implied covenant of good faith and fair dealing did not apply). The SBA regulations governed these terms, and the borrower committed to compliance with these terms as a condition of loan forgiveness.

While US Cargo alleges "PNC had a duty to become aware of, remain apprised of and communicate to prospective borrowers the most up-to-date and most recently promulgated guidance and other requirements issued by the SBA with respect to PPP loan forgiveness," (dkt 7 ¶ 36), it cites no law supporting this proposition. Illinois law, moreover, cuts the other way. *See Bank One, Springfield v. Roscetti*, 723 N.E.2d 755, 764 (Ill. App. Ct. 1999) ("The covenant of good faith and fair dealing does not enable a [party] to read an obligation into a contract that does not exist."). US Cargo's unsupported, conclusory assertion cannot pass muster on a motion to dismiss. *See Twombly*, 550 U.S. at 555 ("[O]n a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

Under the contract's terms, US Cargo cannot shift to PNC the consequences of its mistake in using PPP funds for an impermissible purpose. PNC therefore did not breach the contract by issuing a loan to US Cargo above the amount ultimately eligible for PPP forgiveness even if it knew or should have known US Cargo would use the funds to pay independent contractors.[3]

---

[3] Though the claim fails at the breach element, US Cargo has also failed to satisfactorily explain how it was damaged by obtaining a business loan it was ultimately not qualified to obtain, at the well-below-market interest rate of 1%.

C.     **Breach of Fiduciary Duty**

US Cargo contends a PNC assumed a fiduciary duty to US Cargo in administering its PPP loan, and that PNC breached that duty by failing to inform US Cargo of the loan forgiveness rules. (Dkt. 7 ¶¶ 84–85). Generally, Illinois does not recognize a fiduciary duty between a lender and a borrower. *See Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992) ("[A] debtor-creditor relationship is not a fiduciary relationship as a matter of law." (citing *Paskas v. Illini Fed. Sav. & Loan*, 440 N.E.2d 194, 198–99 (Ill. 1982))). The only exception occurs where the borrower "was subject to domination and influence on the part of the bank." *Paskas*, 440 N.E.2d at 199. The borrower's placing trust in the bank is insufficient. *Pommier*, 967 F.2d at 1119. For a fiduciary relationship to exist, the borrower must show the lender "gained influence and superiority over him." *Id.*; *see also Paskas*, 440 N.E.2d at 199. "[A] slightly dominant business position . . . [does] not operate to turn a formal contractual relationship into a confidential or fiduciary relationship." *Pommier*, 967 F.2d at 1119 (quoting *Mid-America Nat'l Bank v. First Sav. & Loan*, 515 N.E.2d 176, 181 (Ill. 1987)).

US Cargo has not pleaded sufficient facts to allege a plausible fiduciary relationship. While PNC may have had more knowledge about the PPP and its governing rules than US Cargo, no facts show PNC used its knowledge to "dominate" US Cargo. Providing info sheets and a document checklist about a new federal loan program falls well short of dominating or exerting influence over a prospective borrower. This is standard business practice. Otherwise, any lender

---

Even though it must pay PNC this interest, this calculates to less than $15,000 on the remaining loan principal. US Cargo received about $53,000 in loan forgiveness—essentially, free money. It alleged having spent nearly all its PPP loan on payments to its drivers. It has not alleged that, but for the expectation of a PPP loan, it otherwise would not have had the same business expenses; i.e., that it would have cut its workforce to reduce its expenses by $1.5 million in response to the pandemic emergency. If anything, US Cargo still came out roughly $38,000 ahead in this deal. However, it maintains that it expected a windfall of over $1.5 million in free government funds, so it did not get the full benefit of its "bargain" with PNC. In any event, further analysis is unnecessary as the Court has decided the matter on other grounds.

might be found to be a fiduciary to a prospective borrower merely by sending an email blast to clients about a new product or service. Moreover, PPP rules were publicly available information. Nothing shows PNC represented itself as more knowledgeable about PPP loans than any other approved SBA lender. Nor do facts show PNC held itself out to US Cargo as its only option for a PPP loan.

Though US Cargo alleges it trusted PNC because of its preexisting banking relationship, (dkt. 7 ¶¶ 30, 88), the same was true for the borrower in *Pommier*, where the court held no fiduciary relationship existed with its lender. 967 F.2d at 1119. There, the plaintiff alleged he trusted his bankers, he had a history of working with the bank, and the bank's officers suggested a new loan arrangement with another party to the transaction without plaintiff's knowledge. *Id.* The court nevertheless held these facts insufficient to establish a fiduciary relationship as a matter of law. *Id.* The same is true here. US Cargo's history of banking with PNC and its general trust in PNC and its information do not constitute a fiduciary relationship.

Furthermore, US Cargo is a sophisticated business entity entering into a contract. The contract required US Cargo to acknowledge that it had either "been advised by counsel as necessary or appropriate, or has elected not to seek the advice of counsel." (Dkt. 7-7 at 10). It is difficult to square US Cargo's vague assertion that PNC "exerted its dominance over US Cargo after US Cargo placed its trust and confidence in its banking partner" with the express acknowledgement that US Cargo consented to be bound by the contract either on the advice of its counsel or having opted not to seek such advice. (Dkt. 7 ¶ 88). On these alleged facts, US Cargo cannot sustain its claim for breach of fiduciary duty.

D. **Negligent Misrepresentation**

US Cargo alleges PNC misrepresented that "US Cargo would have no repayment obligation with respect to loan proceeds used to pay independent contractors." (Dkt. 7 ¶ 95). Because that representation was false, and because US Cargo alleges it had reasonably relied on this false statement before taking out and spending the PPP loan, US Cargo brings a claim for negligent misrepresentation. (*Id.* ¶¶ 90–97). Plaintiffs claiming negligent misrepresentation must plausibly allege:

> (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information.

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 332 (Ill. 2006). Generally, tort actions for purely economic damages are barred under the *Moorman* doctrine, which holds that purely economic loss is not generally recoverable in tort, because contract law properly protects parties' expectation interests. *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 452 (1982). But Illinois also recognizes a narrow exception to the *Moorman* doctrine and "has imposed a duty on a party to avoid negligently conveying false information only if the party is in the business of supplying information for the guidance of others in their business transactions." *First Midwest Bank, N.A.*, 843 N.E.2d at 332 (citing *Brogan v. Mitchell Int'l, Inc.*, 181 Ill.2d 178, 183–84 (1998)).

To qualify for the exception to the *Moorman* doctrine on a tort claim for purely economic damages, "(i) the defendant must supply the information in the course of his or her business and (ii) the information must be supplied for the guidance of others in their business transactions."

13

*Hardford Fire Ins. Co v. Henry Bros. Construction Mgmt. Serv., LLC*, 877 F. Supp. 2d 614, 619 (N.D. Ill. 2012) (citing *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1199– 1200 (Ill. 1997)). The exception does not hinge simply on whether a party provides information— "a great many businesses involve an exchange of information." *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebal & Frazier, Ltd.*, 555 N.E.2d 346, 351 (Ill. 1990) (quoting *Rankow v. First Chi. Corp.*, 870 F.2d 356, 364 (7th Cir. 1989)). Rather, the nature of the business transaction defines the parameters of the defendant's duty to provide information to guide the plaintiff who enters that transaction. *See First Midwest Bank*, 843 N.E.2d at 335 (explaining that, in the context of a contract for a title commitment, the nature of the title commitment defines the parameters of the title insurer's duty); *see also Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468, 475 (7th Cir. 1997) (noting analysis of duty to supply information focuses "on the nature of the information and its relation to the particular type of business conducted" (internal citations omitted)).

Here, US Cargo alleges PNC, "a financial institution, was in the business of supplying information for the guidance of borrowers in their business transactions. Specifically, here, PNC was in the business of providing information by way of 'Information Sheets' and Checklists to guide would-be borrowers in their navigation of PPP loan repayment rules." (Dkt. 7 ¶ 94). Illinois courts have suggested a spectrum of businesses that supply information for purposes of the *Moorman* doctrine exception, "with pure information providers at one end and pure tangible good providers at the other." *Tolan and Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 297 (Ill. App. Ct. 1999) (quoting *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, No. 91 C 6103, 1994 WL 687579, at *15 (N.D. Ill. Dec. 7, 1994)). Whether a bank is "in the business of supplying information" is a difficult and fact-specific question. *See id.* (citing *Rankow*, 870 F.2d at 364); *see*

14

*also, e.g.*, *Gen. Elec. Capital, Corp. v. Equifax Servs., Inc.*, 797 F. Supp. 1432, 1443 (N.D. Ill. 1992) ("Financial services provided by banks . . . present a uniquely difficult problem due to the fine line between supplying financial information and completing actual financial transactions.").

Ultimately, the Court need not resolve the question of whether PNC "is in the business of supplying information for the guidance of others in their business transactions" with respect to this particular loan program. *First Midwest Bank, N.A.*, 843 N.E.2d at 332. Even assuming that PNC was in the business of supplying information about the PPP loan forgiveness terms and thus qualifies for the exception to the *Moorman* doctrine, US Cargo fails to allege facts plausibly demonstrating other elements of the negligent misrepresentation claim. The first element is a false statement of material fact. *Id.* US Cargo alleged PNC "misrepresented the fact US Cargo would have no repayment obligation with respect to loan proceeds used to pay independent contractors. That representation was false." (Dkt. 7 ¶ 95). But US Cargo has pointed to no statement in the information sheet, document checklist, or Loan Documents that US Cargo would have no loan obligation, or that payments to independent contractors counted as the permitted loan purpose of "payroll costs." Nor could it. The documents contain no such statements. (*See generally* dkts. 7-3, 7-4, 7-5, 7-6, 7-7). Again, US Cargo relies on its own subjective misunderstanding of the program terms, not affirmative statements about those terms made in PNC's written contract or other informational documents. But US Cargo's misunderstanding does not make PNC's statements false, which is a necessary element for a negligent-misrepresentation claim.

The *only* allegedly false statement PNC made to US Cargo was in the initial solicitation: "In soliciting a PPP Loan from US Cargo, PNC representatives specifically indicated to US Cargo that Loan proceeds used to pay truck drivers who worked for US Cargo as independent contractors would be 'eligible for forgiveness' (i.e., such payments would qualify as a 'Permitted Loan

15

Purpose').") (Dkt. 7 ¶ 35). Although US Cargo fails to allege who made this statement or in what context, it appears in none of the Loan Documents.

The plaintiff's reliance on the false statement "must be justified, *i.e.*, he must have had a right to rely." *Soules v. General Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980). US Cargo had no such right and therefore could not reasonably rely on one statement allegedly made at the outset of the transaction. The Note contains a merger clause that integrates the contract's terms and expressly excludes any representations made outside the written contract. *See supra* note 2. The contract itself contained no assurances of loan forgiveness and in fact required the borrower to certify its compliance with all SBA rules. *See Hardee's of Maumella, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 576 (7th Cir. 1994) (affirming dismissal of misrepresentation claim where "it is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying"); *see also Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1208 (7th Cir. 1998) ("[Plaintiffs] cannot not establish they reasonably relied on pre-contract promises when the contractual language was so explicitly to the contrary."). Moreover, US Cargo apparently made no independent inquiry into the rules to which it voluntarily bound itself by contract—and nothing prevented it from doing so. *See Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 692 N.E.2d 812, 818 (Ill. App. Ct. 1998) (dismissing negligent-misrepresentation claim because plaintiff's reliance must be reasonable considering all facts and circumstances, and "[i]f ample opportunity existed to discover the truth, then reliance is not justified").

US Cargo's reliance on a single precontractual statement made at the loan solicitation stage was unjustified. Neither the Loan Documents nor the informational documents contain false statements of material fact. They do not guarantee loan forgiveness; they state the borrower *may*

16

qualify if it follows the SBA's governing rules and uses loan proceeds for a permitted purpose. They do not state that payments made to independent contractors qualify as "payroll costs."

E.   **Promissory Estoppel**

Promissory estoppel "is a common-law doctrine adopted to permit the enforcement of promises that are unsupported by consideration, such as gratuitous promises, charitable subscriptions, and certain intrafamily promises." *Matthews v. Chi. Transit Authority*, 51 N.E.3d 753, 779 (Ill. 2016). But, as the Illinois Supreme Court has emphasized, "[a]pplication of promissory estoppel is proper only in the absence of an express agreement. This rule applies because promissory estoppel is intended as a means to enforce gratuitous promises and is not designed to provide a party to a negotiated bargain a 'second bite at the apple' if it fails to prove breach of contract." *Id.* (internal citations omitted).

There is no real dispute here that the parties have an express, written, fully executed agreement. US Cargo has not alleged PNC made gratuitous promises unsupported by consideration and then reneged on those promises to US Cargo's detriment. The Loan Documents as integrated in the Term Note constitute a valid, enforceable contract to which US Cargo knowingly and consentingly bound itself.

F.   **Unjust Enrichment**

US Cargo brings its unjust enrichment claim in the alternative to the underlying claims sounding in contract and tort. In Illinois, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511,

516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)).

Like promissory estoppel, however, under Illinois law "recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and defendant." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) (citing *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. 2005); *Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. 2004)). It is an equitable remedy for a contract implied in law. *Id.* An express contract precludes an implied contract; likewise, "no equitable remedy can lie where a legal one is available." *Id.* The alternative-pleading option is limited: "A plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is *not* an express contract, then the defendant is liable for unjustly enriching himself at [plaintiff's] expense." *Id.*

Again, US Cargo has not alleged that no express contract governed its agreement with PNC. The Loan Documents readily dispel any plausible inference that the parties' contract was only implied. Moreover, US Cargo acknowledges throughout its Complaint, the attached Loan Documents, and its brief that an express contract existed with PNC. US Cargo cannot sustain an unjust-enrichment claim.

## CONCLUSION

For these reasons, the Court grants PNC's Motion to Dismiss US Cargo's Amended Complaint for failure to state a claim on which relief can be granted. [14] The Court dismisses the Complaint without prejudice, with leave to amend if PNC can allege facts stating a claim under any of its theories of recovery. This dismissal without prejudice will convert to dismissal with prejudice on February 25, 2023 if no amended Complaint is filed.

                                                _____
                                                Virginia M. Kendall
                                                United States District Judge

Date: January 24, 2023